UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

                            *

BINSAR RIONALD SIAHAAN       *      Civil No. PWG-20-02618
           Petitioner
                            *

v.

                            *

FRANCISCO MADRIGAL, ET AL.
           Respondents    *
                         *****

## MEMORANDUM OPINION

### INTRODUCTION

This case is before me on Petitioner Binsar Rionald Siahaan's ("Siahaan" or "Petitioner")

Motion for a Temporary Restraining Order and Stay of Removal, as well as his Petition for a Writ

of Habeas Corpus. Siahaan raises several claims, alleging that the Respondents[1] have violated

immigration regulations, the Fourth and Fifth Amendments to the United States Constitution, and

several federal statutes and treaties. The Respondents filed an Emergency Motion to Dismiss and

a Motion for Change of Venue.[2] I held a September 14, 2020 telephone conference with the parties,

after which I issued an order memorializing the Government's agreement not to remove Siahaan

until after a ruling had been made on his TRO motion. The parties also set a briefing schedule, and

---

[1]     The Respondents in this matter are Acting Director of the Baltimore Field Office for U.S. Immigration and Customs Enforcement, Francisco Madrigal; Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement, Tony Pham; and DHS Acting Director Chad Wolf. They are referred to in this Memorandum as "Respondents" or the "Government."

[2]     Although the Respondents initially challenged this Court's venue as well as its subject matter jurisdiction, ECF No. 6, during the hearing they withdrew this challenge and consented to venue in this District. For that reason, I will not further analyze the venue issues originally raised in their motion.

the Government then filed a response in opposition to Siahaan's motion. Siahaan filed a reply and I held an October 2, 2020 motions hearing via ZoomGov.

Siahaan seeks to remain in the United States while litigating his various motions pending before the Board of Immigration Appeals (BIA), which include a motion seeking to reopen his removal status, granting of his asylum claim, and for protection under the Convention Against Torture ("CAT"), and, if unsuccessful at the BIA, he seeks to remain in the United States while he appeals any adverse decision by the BIA to the Fourth Circuit Court of Appeals. The Government seeks to remove him immediately to his country of citizenship—Indonesia—and argues that I do not have subject matter jurisdiction to hear this case. For the reasons that follow, I find that I do have jurisdiction, and that the Petitioner has shown a substantial likelihood of prevailing on at least some of his claims, and that he would suffer irreparable harm if removed before his BIA proceedings have been resolved.  I therefore will issue a preliminary injunction preventing the Government from removing him during the pendency of his motions before the BIA and any subsequent appeal to the Fourth Circuit, and requiring his return from the detention facility in Georgia (where he had been taken by Immigration and Customs Enforcement ("ICE") in preparation for his removal to Indonesia) to ICE custody in Maryland.

## BACKGROUND

Siahaan has resided in the United States for over 30 years. He is law-abiding, having no criminal history. He is a devout Christian who volunteers at and resides in a home located on the property of the Glenmont United Methodist Church in Silver Spring, Maryland. And he has a family here with his wife, Eko Dewi Rahayu Sukemi, and their two children, both of whom are American citizens. Petit.'s Mot. Mem. for TRO at 1-2 (ECF 2-1). Siahaan's case isn't the typical immigration habeas proceeding involving an individual charged with illegal reentry or convicted

of a deportable offense: in 1989, Siahaan was admitted to the United States on an A-3 Diplomatic Attendant visa. Resp.'s Opp. at 2 (ECF. No. 14).[3] As a non-immigrant visitor, he was permitted to remain in the United States until January 7, 1990. *Id.* However, he stayed beyond the permitted time and applied for asylum in 2003 before the United States Citizenship and Immigration Services ("USCIS"). *Id.* USCIS denied that application; on December 19, 2003, an Immigration Judge ordered Siahaan removed to Indonesia but allowed him to do so voluntarily within approximately two months. *Id.* Siahaan appealed the decision to the Board of Immigration Appeals ("BIA"), which denied his appeal and upheld the removal order on May 31, 2005. *Id.* Siahaan continued his efforts to remain in the United States, petitioning in the Fourth Circuit for a review of the BIA decision, which was similarly denied on February 13, 2006. *Id.* at 3. Upon the Fourth Circuit issuing its mandate, Siahaan was subject to a final order of removal. *Id.*

Siahaan's removal status remained dormant for several years, but on January 27, 2012, ICE detained Siahaan and released him on an Order of Supervision ("OSUP"). *Id.* While supervising Siahaan, ICE sought travel documents to effectuate his removal. On February 25, 2020, ICE revoked Siahaan's supervision, and in March 2020, Siahaan filed a motion to reopen his BIA proceedings. *Id.* Siahaan was released on supervision on April 3, 2020.

After his April release, ICE obtained valid travel documents for Siahaan to be returned to Indonesia; on September 20, 2020, ICE again revoked his release. *Id.* In effectuating the revocation, ICE agents first contacted Siahaan at his family home in Silver Spring, Maryland. Petit.'s Mot. Mem. for TRO at 1. The parties dispute whether the ICE agents who arrested Siahaan realized at that time that the house where he lives is located on church property (Petitioner claims

---

[3]     This factual recitation is largely derived from the Government's opposition. Petitioner "generally does not dispute the facts as articulated by" the Government. Petit.'s Reply at 2 (ECF No. 17).

that the Department of Homeland Security has a policy that prohibits arresting noncitizens who are located in "sensitive areas" like churches, Petit's Mot. at 11). Petit.'s Reply at 17; Ex. A to Petit.'s Reply at ¶ 4 (ECF No. 17-1); Ex. C to Petit.'s Reply at ¶ 3 (ECF No. 17-4). The agents told Siahaan that they needed to check his ankle monitor, but after entering his house and ordering him to get dressed, the agents handcuffed Siahaan and took him to the Baltimore Field Office. Petit.'s Mot. for TRO at 1-2. Upon arriving at the field office, Siahaan was informed that ICE had the requisite travel documents to effectuate his removal to Indonesia and that he would be removed from the United States. *Id.* Siahaan was again transported; he is currently detained at the Irwin County Detention Center in Ocilla, Georgia. Petit.'s Reply at 5.

Some additional background information is warranted regarding Siahaan's pending motion to reopen before the BIA. The motion, filed pursuant to INA §§ 240(c)(7), 240(c)(7)(C)(ii)[4] and 8 C.F.R. § 1003.2(c), raises claims of ineffective assistance of counsel and changed circumstances in Indonesia that materially alter (and improve) his eligibility for asylum. Ex. B to Petit.'s Pet. for Writ of Habeas Corpus at 13 (ECF No. 1-2). Siahaan has requested relief on several grounds, including applying for withholding of removal under the Convention Against Torture ("CAT"). *Id*. Siahaan asserts that the CAT applies to his case because in Indonesia (a predominantly Islamic nation), Christians, like Siahaan, are suffering state-supported persecution. Counsel for Siahaan paints a picture of the violence Christians suffer, citing Human Rights Watch reports that Islamic groups threaten and intimidate Christians with violence. Ex. D to Petit.'s Pet. for Writ of Habeas Corpus at 7 (ECF No. 1-2). Siahaan asserts that Christians face "discrimination, intimidation, and violence," and also that Indonesia continues to endure long-simmering sectarian conflicts that further contribute to risk that he will face persecution if he is removed there. Ex. B to Petit.'s Pet.

---

[4]        Codified at 8 U.S.C. § 1229a(c)(7)(C)(ii).

for Writ of Habeas Corpus at 18. He argues that if he were to be removed to Indonesia, he would almost certainly face persecution and violence due to his religious beliefs.

When Siahaan first sought asylum in the United States in 2003, this was not the case. Now, Siahaan contends that his life would be in jeopardy upon removal to Indonesia. *Id.* The Liggins Declaration, which the Government submitted as an exhibit to its Response, removes all doubt that "ICE intends to remove [Siahaan] in the coming weeks" unless this Court intervenes, and Siahaan will be removed to his home country of Indonesia. Ex. A to Resp.'s Opp. at 4, ¶¶ 20, 23.

## DISCUSSION

I first will consider whether I have subject matter jurisdiction in light of 8 U.S.C. § 1252(g). While it might be hoped that this would be a straightforward exercise in statutory construction, aided by Supreme Court, Circuit and District court decisions that provide clear and consistent guidance, experience shows that it is anything but. A district judge that must make such a decision, usually in the time-sensitive environment of a TRO or Preliminary Injunction motion, must navigate through a succession of Congressional amendments to immigration laws, each of which undertook to narrow—if not outright strip—the courts of any authority to review the removal decisions of the Attorney General, look (sometimes in vain) for a controlling decision from his or her Circuit Court of Appeal,[5] and try to make sense of legion inter-circuit and out-of-circuit district

---

[5]     *Compare Bowrin v. U.S. Immigration & Naturalization Service*, 194 F. 3d 483,490 (4th Cir. 1999) ("[S]tatutory habeas jurisdiction lies firmly within the scope of judicial review of a [28 U.S.C.] § 2241 habeas petition," concluding "[D]istrict court habeas review under § 2241 includes the ability to review Bowrin's petition for both statutory and constitutional questions.") *with Mapoy v. Carroll*, 185 F. 3d 224, 230 (4th Cir. 1999) ("Congress could hardly have been more clear and unequivocal that courts shall not have subject matter jurisdiction over claims arising from the actions of the Attorney General enumerated in [8 U.S.C.] § 1252(g) other than jurisdiction that is specifically provided by § 1252. The district court, therefore, could not assert jurisdiction over Mapoy's claim challenging the BIA's execution of an order of deportation entered against him unless such jurisdiction is conferred by § 1252 . . . . Because Mapoy's claim is a thinly veiled

court opinions that reach diametrically opposite results.[6] Fortunately for me, my time-pressured journey through this statutory and decisional thicket was aided immensely by the thoughtful and lengthy decision from Judge M. Hannah Lauck, in *Joshua M. v. Barr*, 439 F. Supp. 632 (E.D. Va. 2020), to which I will refer frequently, and gratefully.

8 U.S.C. § 1252(g)[7] aims to strip district courts from exercising jurisdiction to consider habeas petitions in connection with three types of decisions made, or actions taken by, the Attorney General that affect the status of noncitizens. It reads:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g). What matters most for purposes of the § 1252(g) analysis in this case is determining exactly what decision or action of the Attorney General Siahaan is challenging. The

---

attempt to evade the dictates of § 1252, we hold the district court lacked jurisdiction to hear his complaint and habeas petition.").

[6]    *Compare Lin v. Nielsen*, 377 F. Supp. 3d 556 (D. Md. 2019) (concluding that 8 U.S.C. § 1252(g) did not strip district courts of jurisdiction to rule on a noncitizen's habeas petition filed under 28 U.S.C. § 2241 raising statutory and constitutional challenges to an order of removal) *with Ashqar v. Hott*, Case No. 1:19-cv-716, 2019 WL 2712276 (E.D. Va. June 6, 2019) (concluding that 8 U.S.C. § 1252(g) did strip district courts of jurisdiction to hear  28 U.S.C. § 2241 habeas petitions filed by noncitizens raising legal and constitutional challenges to a removal order).

[7]    Between 1961 and 2005, Congress passed a series of amendments to immigration law intended, in part, to strip district courts from exercising habeas jurisdiction to review legal challenges to actions by the Attorney General affecting the status of noncitizens, including removal orders. They included the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IRRIRA"), and the REAL ID ACT of 2005. The current version of the jurisdiction stripping section relied on by the Respondents in challenging this Court's subject matter jurisdiction, 8 U.S.C. § 1252(g), was enacted as part of the REAL ID ACT in 2005. *Joshua M. v. Barr*, 439 F. Supp. 3d 632, 666-67 (E.D. Va. 2020).

Supreme Court has ruled that the statute strips courts of jurisdiction to decide challenges "only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482 (1999) (*AADC*) (quoting § 1252(g)). The Court determinedly rejected the notion, advanced by the Government, that the listing of these discrete events referred "to all claims arising from deportation proceedings." *Id.* Of course, the *AADC* decision was rendered before the enactment of the REAL ID ACT, Congress's most recent attempt to strip the courts of jurisdiction, but that does not change things, because it recently endorsed its finding in *AADC*, explaining that the language in § 1252(g) does not "sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General. Instead [the Court] read[s] the language to refer just to those three specific actions themselves." *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (citing *AADC*, 525 U.S. at 482-83). Justice Alito, writing for the Court, recognized that the phrase "arising from" is "capacious," and that the court interprets the phrase to avoid "results that 'no sensible person could have intended.'" *Id.* at 840 (citing *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 943 (2016)).

And that is not all. The Supreme Court consistently has rejected the type of categorical challenge to district court habeas jurisdiction in immigration cases raised here by the Respondents. For example, the Supreme Court has held, in the context of the general habeas corpus statute, 28 U.S.C. § 2241, that the statutory scheme containing 1252(g) does not strip jurisdiction where a pure question of law is before the court.[8] *I.N.S. v. St. Cyr*, 121 S. Ct. 2271, 2282 (2001). *See also Zadvydas v. Davis*, 533 U.S. 678, 688 (2001) ("We conclude that § 2241 habeas corpus

---

[8]     The *St. Cyr* decision did not deal directly with 1252(g), but it affirmed *AADC*, which did. *I.N.S. v. St. Cyr*, 121 S. Ct. 2271, 2285 n. 34 (2001).

proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention.").

While the Fourth Circuit has not revisited this issue recently, it did offer guidance in *Bowrin*, which held that district courts may review § 2241 petitions on behalf of noncitizens when those petitions present either statutory or constitutional questions. *Bowrin v. I.N.S.*, 194 F.3d 483, 490 (4th Cir. 1999) ("We cast our lot with those circuits that have found that statutory habeas jurisdiction lies firmly within the scope of judicial review of a § 2241 habeas petition.  Historically, the Supreme Court has recognized that aliens could obtain review of statutory questions in habeas proceedings, even when 'judicial review in the immigration context was reduced to the minimum required by the Constitution.' . . . This precedent supports our holding that district court habeas review under § 2241 includes the ability to review Bowrin's petition for both statutory and constitutional questions.") (internal citations omitted). Importantly, the Fourth Circuit stressed the narrowness of its holding, emphasizing that "[o]nly questions of pure law will be considered on § 2241 habeas review." *Id.*

Before addressing what this case *does* involve, it is equally important to understand what it *does not* involve. Siahaan is not challenging the Attorney General's decision (acting through the BIA) to 1) commence proceedings against him; 2) adjudicate his case; or 3) execute a removal order. As explained below, he concedes that he is not challenging these discretionary decisions. In fact, Siahaan could not have put it any more plainly than he did when he unreservedly acknowledged that "Petitioner concedes that if his motion to reopen [his removal order] is denied and he either declines to seek judicial review with the U.S. Court of Appeals for the Fourth Circuit, or, if that court denies his motion for a stay of removal, then Respondents would be free to remove him." Petit's Reply at 11, n. 5 (ECF No. 17).

8

Notwithstanding the above, the parties dispute whether 1252(g) strips this Court of jurisdiction in the present case. The Government argues 1252(g) bars jurisdiction here, citing *Mapoy v. Carroll*, 185 F.3d 224, 227 (4th Cir. 1999). Resp.'s Opp. at 7. *Mapoy* held that a noncitizen's claim for declaratory and injunctive relief was barred, reasoning that because he moved for a stay of removal, his motion *related* to the BIA's execution of a removal order. *Mapoy*, 185 F.3d at 228. The basis of Mapoy's claim, the Fourth Circuit observed, "was the BIA's order denying his motion for Stay of Deportation and its continued detention of Mapoy." *Id*. Since the petitioner's claims in *Mapoy* "clearly arose from the INS's decision to execute a removal order," the Fourth Circuit held § 1252(g) barred the claim. *Id.* The Government argues Siahaan's claims are similar, despite his "various statutory, regulatory, and constitutional claims," because district courts are barred from hearing any claims "arising from the decision to commence a removal proceeding or execute a removal order." Resp.'s Opp. at 7.

Siahaan argues that his claims do not fall victim to the § 1252(g) bar because he "does not challenge Respondents' prosecutorial discretion to remove him." Petit.'s Reply at 11. Instead, Siahaan argues that I must consider his claims because the Government violated the law when they detained him in order to remove him before he can complete his exercise of his statutory right to move to reopen, apply for asylum, and protection under the CAT, which is currently pending before the BIA. *Id.* at 11-12. Specifically, he brings claims under the Immigration and Nationality Act, the Administrative Procedures Act, and the Due Process Clause of the 5th Amendment. Petit.'s Mot. Mem. for TRO at 7. In fact, as noted above, Siahaan deflates the Government's argument that he is challenging the removal order, conceding in his reply brief "that if his motion to reopen is denied and he either declines to seek judicial review with the . . . Fourth Circuit, or, if that court denies his motion for a stay of removal, then Respondents would be free to remove him."

Petit.'s Reply at 11, n.5. Succinctly, all that Siahaan wants is to be able to resolve his pending motion to reopen and for related relief from within the United States, where he has access to his lawyers and is not at risk of suffering religious persecution.

It is not difficult to see the harsh ramifications Siahaan would suffer if the Government's position prevails. Central to his motion to reopen is his contention that since his departure from Indonesia in 1989, conditions there have significantly changed such that Christians face persecution at the hands of Islamists, and the Indonesian Government cannot or will not protect him from this threat. For that reason, he seeks protection under the CAT. Only four months ago, Justice Kavanaugh, writing for the majority of the Supreme Court, succinctly captured the essence of the lifeline that a successful CAT determination offers to noncitizens like Siahaan who are facing removal to a dangerous and hostile country of origin. He said "[d]uring removal proceedings, a noncitizen may raise claims under the international Convention Against Torture, known as CAT. If the noncitizen demonstrates that he likely would be tortured if removed to the designated country of removal, then he is entitled to CAT relief and may not be removed to that country (although he still may be removed to other countries)." *Nasrallah v. Barr*, 140 S. Ct. 1683, 1687 (2020).

If I were to hold that I do not have jurisdiction, ICE, as the Liggins declaration makes perfectly clear, promptly would remove Siahaan to Indonesia while his 8 U.S.C. § 1229a(c)(7)(C)(ii) motion to reopen is still pending *and* he could yet prevail on his asylum and CAT claims (either before the BIA or the Fourth Circuit). But if he did, his victory would be entirely pyrrhic, for he already would be in Indonesia, to where he should not have been removed in the first place if he qualified for CAT protection, and certainly unable to enjoy any benefit of asylum status in the distant United States. Against the backdrop of the realistic risk of calamitous

circumstances that Siahaan could face upon removal to Indonesia, his APA and 5th Amendment claims question the *legality*—not the *wisdom*—of the Respondents' rush to remove him. After all, he is not some noncitizen who entered the United States illegally, nor one who committed crimes once he arrived. By all accounts, Siahaan is a beloved member of the Silver Spring community. He volunteers at his church. He lives on church property. He is married and has two teenage children who are American citizens, and he has always worked to support them. When he has been released under ICE supervision awaiting removal, he always has complied with all his conditions of release. He is neither a flight risk nor a danger to the public. This hardly qualifies him as public enemy number one, whose very presence in this country is so inimical that he must be removed even before he has had a fair opportunity to complete the administrative and judicial process to which he is entitled under the immigration law. To insist, as the Respondents do, that this Court lacks jurisdiction because of § 1252(g) to determine the purely legal questions of whether his removal under these circumstances violates the statutory and constitutional provisions that his habeas petition has raised runs contrary to the consistent rulings of the Supreme Court for at least twenty years. And, as we will see, their reliance on *Mapoy* as authority for their position is misguided.

As noted, the Respondents rely on the Fourth Circuit's 1999 opinion in *Mapoy*. The Petitioner relies on the Fourth Circuit's decision only a few months later in *Bowrin*. In terms of the parties' arguments on § 1252(g), precedent disagrees with the Government's position. As an initial matter, Judge Blake of this Court found the *Mapoy* decision to be inconsistent with *Bowrin*—the more recent decision—in holding that she had jurisdiction to hear an immigration petitioner's § 2241 habeas claim, § 1252(g) notwithstanding. *Woo v. Reno*, No. CIV. CCB-00-2630, 2000 WL 1481302, at *10 (D. Md. Sept. 20, 2000). Siahaan also points to the Supreme

Court's 2001 *St. Cyr* decision which, he argues, resolved the inconsistency between *Mapoy* and *Bowrin*, in favor of *Bowrin*, holding that cases raising a pure question of law (in St. Cyr's case, his statutory eligibility for discretionary relief) are not discretionary and thus not barred by § 1252(g). *St. Cyr*, 533 U.S. at 314 n. 38. Judge Lauck, faced with a similar issue, agreed. In *Joshua M. v. Barr*, where the Government similarly argued that *Mapoy* and § 1252(g) stripped the district court of jurisdiction in a noncitizen's habeas suit, Judge Lauck found that *St. Cyr* resolved the conflict between *Mapoy* and *Bowrin*. She reasoned "at a minimum, habeas corpus jurisdiction remain[s] in the district court for criminal aliens raising 'pure' questions of law relating to discretionary relief that could not be heard in the court of appeals on direct review." *Joshua M. v. Barr*, 439 F. Supp. 3d 632, 667 (E.D.Va. 2020).

And this is not the end of it. Siahaan also argues that Respondents' reading of § 1252(g) violates the Suspension Clause of the Constitution. Art. I, § 9. If I were to rule that I do not have jurisdiction due to § 1252(g), Siahaan would be left without immediate legal recourse if removed before his motions pending before the BIA are resolved, and he receives a final order, enabling him to appeal to the Fourth Circuit Court of Appeals.  8 U.S.C. § 1252 (b)(9). ("Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from an action or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a *final order* under this section.") (emphasis added).  If he has no recourse to habeas relief in this Court, and cannot seek relief from the Fourth Circuit until after he has received a final order from the BIA denying his pending motions, then he is caught in a jurisdictional limbo, with no avenue to challenge the legality of the Government's decision to remove him before he completes his statutory rights to litigate his motion to reopen his removal.

Once again, Judge Lauck's evaluation of a similar Suspension Clause issue in *Joshua M.* is instructive.[9] A court first determines whether a petitioner may invoke the Suspension Clause by evaluating three factors from *Boumediene*: "(1) the citizenship of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ." *Boumediene v. Bush*, 553 U.S. 723, (2008). A court then determines whether a petitioner has adequate alternatives to a habeas petition. *Id.* at 792; *see also Joshua M.*, 439 F. Supp. 3d at 671.

I find that Siahaan may invoke the Suspension Clause. Looking first to citizenship and status, Siahaan is not a citizen,[10] but he has longstanding ties to the United States, arriving legally, and then remaining after his temporary visa expired for over 30 years. He has no criminal convictions, is married, and has two children who are American Citizens. These contacts are "sufficient to establish . . . [Siahaan] within the 'class of persons who are part of a national

---

[9]       The Government cites *DHS v. Thuraissigiam*, 140 S. Ct. 1959 (2020), which held that a statute barring judicial determination that an asylum applicant lacks credible fear of persecution did not violate the Suspension Clause, to argue the Suspension Clause does not apply to Siahaan's case. But *Thuraissigiam* involved a noncitizen apprehended a mere 25 yards after crossing the border into the United States. These noncitizens are subject to expedited removal, unless they can convince an asylum officer that they have a credible fear of persecution if removed, in which case they are entitled to a more comprehensive hearing with the procedural protections of a standard removal hearing. If they are unsuccessful at this hearing, and file a petition for a writ of habeas corpus, federal courts may not review the determination of the immigration officials that the applicant for admission does not have a credible fear of persecution. 8 U.S.C.§ 1252(e)(2), 8 U.S.C. § 1252(a)(2)(A)(iii). Thus, *Thuraissigiam* did not analyze § 1252(g) in the context of a Suspension Clause claim. Moreover, if read more broadly than the narrow facts it presented, *Thuraissigiam* would overrule *St. Cyr,* which it did not. For that reason, I do not find that it dooms Siahaan's Suspension Clause claim.

[10]       Judge Lauck recognized that, while relevant, citizenship is not dispositive. *See Joshua M.* 439 F. Supp. 3d at 672.

community or who have otherwise developed sufficient connection with this country to be considered part of that community.'" *Joshua M.*, 439 F. Supp 3d at 672 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).

Second, evaluating the nature and site of apprehension and detention, Siahaan was initially detained by ICE agents (allegedly under false pretenses) at his home on church property, not for having committed any criminal offense, and then was quickly whisked away out of state. If ever there was a time the Great Writ[11] should be available, it is when the Government engages in conduct that results in rapid and, at times, incognito detentions. *See* Ex. B to Petit's Reply at ¶ 11, 13-20 (Affidavit of Elsy Ramos Velasquez, Esq.) (ECF No. 17-2). As the Supreme Court has said, the writ of habeas corpus "has been the judicial method of lifting undue restraints upon personal liberty." *Price v. Johnston*, 334 U.S. 226, 269 (1948). Finally, the practical obstacles to invoking the writ of habeas corpus are minimal, "involving no serious practical obstacles to permitting habeas corpus proceedings other than the kind of 'incremental expenditures of resources' that the Supreme Court deemed not dispositive to the question of granting the writ." *Joshua M.* at 672 (citing *Boumediene*, 553 U.S. at 769).

Having determined that Siahaan may invoke the Suspension Clause, I must next assess whether he has adequate alternatives to habeas corpus. He does not. Siahaan has pending before the BIA, a motion to reopen his removal proceedings that alleges, among other things, that he will be persecuted due to his religious beliefs if removed to Indonesia, in violation of the CAT. Ex. B

---

[11]     Justice John Marshall first used the term "Great Writ" in 1806: "Whatever motives might induce the legislature to withhold from the *supreme* court the power to award the great writ of *habeas corpus*, there could be none which would induce them to withhold it from *every* court in the United States; and as it is granted to *all* in the *same sentence* and by the *same words*, the sound construction would seem to be, that the first sentence vests this power in all the courts of the United States; but as those courts are not always in session, the second sentence vests it in every justice or judge of the United States." *Ex parte Bollman*, 8 U.S. 75, 96 (1807).

to Petit.'s Pet. for Writ of Habeas Corpus at 13. The Government asserts that Siahaan has an adequate substitute for habeas corpus because he may continue to pursue his motion to reopen even if he is removed. Resp.'s Opp. at 19. As a general proposition, this undoubtedly is true, and Siahaan does not disagree. But the facts of his particular circumstances belie his ability to do so, as his contention is that he will face persecution, and possibly death or serious injury because of his religious beliefs, which significantly undermines as a practical matter his ability to effectively prosecute his claims pending before the BIA. And in similar circumstances, other courts have concluded that threats of physical injury within a country of removal vitiate the ability to effectively prosecute claims before the BIA, and any subsequent appeal to a Circuit Court of Appeal making 8 U.S.C. § 1229(c)(7)(C)(ii) and § 1252(b)(9) an inadequate substitute for habeas relief. *See, e.g.*, *Joshua M.*, 439 F. Supp. 3d at 677-76; *Diaz-Amezuca v. Barr*, 402 F. Supp. 3d 963, 967 (W.D. Wash. 2019) (holding § 1252(g) violated the Suspension Clause where petitioner alleged he would be a target of gang violence upon removal to Mexico); *Compere v. Nielsen*, 358 F. Supp. 3d 170, 173 (D.N.H. 2019) (holding the same after finding petitioner would be unable to litigate motion upon removal to Haiti); *Sean B. v. McAleenan*, 412 S. Supp. 3d 472, 488 (D.N.J. 2019) ("[T]he death threats, if carried out, would moot and defeat the review process.").

Therefore, whether interpreting § 1252(g) through the *Bowrin*, *St. Cyr*, and *Jennings* line of cases or under the Suspension Clause, this Court has jurisdiction to hear this case. I find that Siahaan raises pure questions of law, like the petitioners in *St. Cyr*, *Bowrin*, *Joshua M.*, and *Woo*, particularly because he explicitly concedes in his Reply that he is not challenging the Government's discretionary decision-making. Instead, Siahaan challenges Government conduct that violates his right to seek statutory and regulatory relief under the INA. Thwarting these efforts would, at a minimum, be arbitrary and capricious, in violation of the APA. *FCC v. Fox Television*

15

*Stations, Inc.*, 556 U.S. 502, 515 (2009) (observing that an agency may not disregard its own rules); *see also Lin v. Nielsen*, 377 F. Supp. 3d 556 (D. Md. 2019) (finding arbitrary and capricious petitioner's arrest after he voluntarily appeared for an interview to apply for a waiver of inadmissibility before USCIS).

## MOTION FOR A PRELIMINARY INJUNCTION

Having resolved the jurisdiction issue, I will now turn to the merits of the motion for a TRO which, due to the Government having received notice of the proceedings, may be converted to a motion for a preliminary injunction. Fed. R. Civ. P. 65(a)(1). *CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.*, 859 F. Supp. 945, 948-49 (D. Md. 1994). A TRO or preliminary injunction serves to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit, ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). A preliminary injunction is distinguished from a TRO only by the difference in notice to the nonmoving party and by the duration of the injunction. *U.S. Dep't of Labor v. Wolf Run Mining Co.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006) (comparing Fed. R. Civ. P. 65(a) with Fed. R. Civ. P. 65(b)). A preliminary injunction cannot issue without notice to the nonmovant. Fed. R. Civ. P. 65(a)(1).

To obtain a TRO or preliminary injunction, [the movant] must "establish that [1] [he] is likely to succeed on the merits, [2] [he] is likely to suffer irreparable harm in the absence of preliminary relief, [3] the balance of equities tips in [his] favor, and [4] an injunction is in the public interest." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). As a TRO is "an extraordinary remedy . . . [it] may only be awarded upon a clear showing that the plaintiff is entitled to such

relief." *See Winter*, 555 U.S. at 22. The plaintiff must satisfy each requirement as articulated, as the Court cannot "conditionally redefine[ ]" the requirements in a "flexible interplay" among the requirements, as the courts in the Fourth Circuit used to do. *Real Truth About Obama, Inc. v. Fed Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009) (invalidating "balance of hardship" approach taken prior to 2009; citing *Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir. 1977)). Additionally, the third and fourth factors merge when the Government is the respondent. *SHOW, Inc. v. USDA*, No. 4:12-cv-00429, 2012 WL 2796568, at *2 (N.D. Tex. July 10, 2012).

The application of these factors to Siahaan's case are straightforward. First, he is likely to succeed on the merits, at a minimum with respect to his Fifth Amendment Due Process claims and his Administrative Procedures Act (APA) claims.  As previously noted, agencies such as ICE are prohibited from engaging in conduct that is arbitrary and capricious. ICE cannot simply proceed with removal while Siahaan has pending a motion to exercise his statutory right to seek reopening of his asylum claim. Removal in this instance, thwarting his ability to realize any benefit from a successful motion, is very likely arbitrary and capricious. *See Lin v. Nielsen*, 377 F. Supp. 3d 556, 564 (D. Md. 2019) (granting preliminary injunction against USCIS after agency deprived petitioner of statutory right to seek waiver of inadmissibility).

Second, the likelihood of irreparable harm is indisputable. Third and fourth, the equities and interests of the public weigh heavily in favor of maintaining the status quo and affording Siahaan an opportunity to remain in this country until he receives a final order from the BIA regarding his motion to reopen his removal status and to obtain asylum and protection under the CAT, and any subsequent appeal to the Fourth Circuit if the BIA rules against him. If he is unsuccessful before both the BIA and the Fourth Circuit, he will submit to removal. I stress again

the background of this case: Siahaan did not commit a crime, nor did he cross the border illegally. He has lived here peacefully and productively for thirty years and is neither a flight risk nor a danger to the community. But ICE still wants to deport him immediately, without allowing him to complete his statutory right to obtain a ruling on his pending motions before the BIA, thereby impeding his ability to vindicate these statutory rights. There is no conceivable measure of equity or public interest that tips in the Government's favor here.

Accordingly, ICE is enjoined from removing Siahaan until he has completed his pending motion to reopen before the BIA and any appeal he chooses to pursue in the Fourth Circuit. ICE is further ordered to return Siahaan to a Maryland detention facility, where he will remain detained unless an ICE Order of Supervision or further Order of this Court authorizes release.

This memorandum supplements the order issued on October 2, 2020 (ECF No. 18).


_____/S/_____
Paul W. Grimm
United States District Judge
District of Maryland